UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

DEBORAH EVANS,          )
     Plaintiff,          )
                      )    Civ. No. 4:08-CV-66
                      )    (MATTICE/CARTER)
                      )
MICHAEL J. ASTRUE,       )
Commissioner of Social Security,   )
     Defendant.         )

REPORT AND RECOMMENDATION

I.  Introduction

Plaintiff's motion for summary judgment (Doc. 11) and the Commissioner's motion for

summary judgment (Doc. 15) are pending before the undersigned Magistrate Judge having been

referred by the District Court for a report and recommendation pursuant to 28 U.S.C. §

636(b)(1)(B).  For the reasons stated herein, it is RECOMMENDED that the plaintiff's motion

for judgment on the pleadings be DENIED, the Commissioner's motion for summary judgment

be GRANTED, and the Commissioner's decision be AFFIRMED.

II. Background

A. Procedural History

Plaintiff, Deborah Evans, seeks judicial review of the final decision of the Commissioner

of Social Security (Commissioner), which found that she was no longer entitled to Disability

Insurance Benefits (DIB) as of February 29, 2004, because there was medical improvement in her

condition that related to her ability to perform work, and that she was able to perform a

significant number of jobs in the national economy given her medical and vocational

characteristics.  42 U.S.C. § 423(f).  The Court has jurisdiction over this action pursuant to 42

U.S.C. § 405(g).

Plaintiff applied for DIB in November 1999, alleging that she became unable to work in October 1999, due to throat cancer (Tr. 118-20, 130). The Agency determined that Plaintiff's impairments met section 13.02(B) of the Listing of Impairments and that she was entitled to benefits as of October 28, 1999 (Tr. 61-62, 317).[1]

The Agency then conducted a continuing disability review of Plaintiff's case and determined that Plaintiff was no longer disabled as of February 29, 2004, and terminated her benefits (Tr. 57-60, 63-64). The Disability Determination and Transmittal document indicates Plaintiff's Date of Last Insured was December 31, 2003 (Tr. 61, 62).

The Agency denied Plaintiff's request for reconsideration of cessation of DIB (Tr. 105-08). Plaintiff requested a de novo hearing before an ALJ (Tr. 55-56).

On November 9, 2006, Plaintiff, represented by counsel, appeared and testified by video conference before ALJ George Evans III (Tr. 423). A medical expert and a vocational expert also appeared and testified at the administrative hearing (Tr. 423). On February 22, 2007, ALJ Evans considered the evidence in the record and concluded that Plaintiff was no longer disabled as of February 29, 2004 (Tr. 12-22). The ALJ noted that medical improvement occurred because Plaintiff underwent supracricoid laryngectomy in December 1999, and follow-up examinations performed every nine months from December 2001 through November 2003, showed no

_____

[1]*Section 13.02(B) of the Listing of Impairments provides:*

*Soft tissue tumors of the head and neck with persistent disease following initial multimodal antineoplastic therapy.*

*20 C.F.R. Pt. 404, Subpt. P, App. 1, § 13.02.*

2

recurrence of carcinoma and were essentially normal (Tr. 17). The ALJ went on to find that, as

of February 29, 2004, Plaintiff had the ability to perform light work that entailed no working with

hazardous machinery or at unprotected heights, only occasional overhead work, no dealing with

the public, unimpaired communication or speech, and no exposure to excessive fumes, dust, or

gases (Tr. 18). Plaintiff requested review of the ALJ's decision, but the Appeals Council denied

review, leaving the ALJ's decision as the Commissioner's final decision (Tr. 6-11). 20 C.F.R. §

404.981. Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g).

## B. Relevant Evidence

*Vocational Background*:

Plaintiff was 51 years old on the date the ALJ issued his decision, and she completed a

high school education (Tr. 21-22, 118, 136). Plaintiff had past relevant work experience as a

licensed practical nurse (Tr. 132).

*The Administrative Hearing*:

Plaintiff, who was represented by a non-attorney, appeared and testified before ALJ

Evans (Tr. 423). Prior to eliciting testimony from Plaintiff, the ALJ indicated that it was a video

hearing and acknowledged Plaintiff's condition (Tr. 426). The ALJ stated that he understood

that Plaintiff's condition may affect her ability to speak and advised her that if she needed any

assistance "as far as taking a break or a drink of water or anything like that be sure to let us

know" (Tr. 426).

Plaintiff testified that she was unable to work due to her fatigue and difficulty

concentrating (Tr. 435). She indicated that she had surgery for her throat cancer and had not had

any recurrences of cancer since February 2004 (Tr. 436). Plaintiff stated that she could sit for 45

3

minutes at a time and stand for about 20 minutes at a time (Tr. 439). Plaintiff also indicated that her voice became weaker as she spoke (Tr. 440). She stated that people had difficulty hearing her on the telephone (Tr. 440).

Plaintiff testified that she lived with her husband and five year old adopted son (Tr. 428). She indicated that her son had cerebral palsy (Tr. 428). Plaintiff stated that the son is actually her grandson and that her daughter was 16 years old at the time he was born and unable to take care of the child (Tr. 429). She indicated that she had a driver's license and the longest distance that she had driven in the past year was 40 miles (Tr. 431). Plaintiff stated that her husband drove her and her son to St. Louis on two occasions in the past year for treatment for him (Tr. 431-32). She testified that she returned to work as a nurse in 2002 but quit working because she was unable to do the job due to fatigue (Tr. 433-34).

*Medical Evidence*:

Plaintiff was diagnosed with thyroid cancer and, in 1999, James Fordice, M.D., performed surgery (Tr. 271-73). In December 1999, James Netterville, M.D., performed supracricoid laryngectomy (Tr. 318-26). Dr. Netterville indicated that Plaintiff tolerated the procedure well (Tr. 318).

In April 2001, Dr. Netterville indicated that Plaintiff had been doing "quite well" since her surgery in December 1999 (Tr. 345). He noted that Plaintiff's voice had "significantly improved" and that the examination of her oral cavity and oropharynx was unremarkable (Tr. 345). Dr. Netterville reported no evidence of recurrence of disease (Tr. 346).

In December 2001, Dr. Netterville reported that Plaintiff denied experiencing any problems with otalgia, dysphagia, or odynophagia (Tr. 344). He indicated that Plaintiff's voice

4

continued to improve (Tr. 344).  On examination, Dr. Netterville noted that Plaintiff had a "very good voice quality " and a normal otologic examination with no evidence of disease (Tr. 344).  He indicated that there was no evidence of carcinoma and that Plaintiff appeared to be doing "quite well" with continually improving voice quality (Tr. 345).

In March 2002, Plaintiff sought treatment from Kimberly B. Shannon, M.D. (Tr. 376).  Dr. Shannon noted that Plaintiff was doing well and had no complaints (Tr. 376).  On examination, Dr. Shannon reported no abnormal clinical findings (Tr. 376).  She scheduled Plaintiff for an EKG and bone density scan (376).  Six months later, Dr. Shannon saw Plaintiff and noted that the EKG and bone density scan were normal (Tr. 375-76).  She reported no clinical abnormalities on examination (Tr. 375).  Subsequent progress notes from Dr. Shannon showed no significant clinical abnormalities (Tr. 367-70).

In May 2002, Dr. Netterville saw Plaintiff, who reported no complaints and denied any dysphagia, odynophagia, otaliga, or additional voice change (Tr. 343).  Plaintiff reported that her voice continued to gradually improve (Tr. 343).  On examination, Dr. Netterville noted that Plaintiff had a "moderately" hoarse voice and no abnormalities on otologic examination (Tr. 343).  He indicated that Plaintiff was "doing well" with no evidence of recurrent disease (Tr. 343).

In February 2003, Dr. Netterville saw Plaintiff, who reported no complaints and denied problems with dysphagia, odynophagia, otalgia, or voice changes (Tr. 342).  On examination, Dr. Netterville reported no significant abnormalities (Tr. 342).  He indicated that Plaintiff was very pleased with the progress of Plaintiff's recovery (Tr. 342).  In correspondence dated February 20, 2003, Dr. Netterville noted that Plaintiff denied any problems with dysphagia, odynophagia,

5

otaliga, voice changes, or breathing difficulties (Tr. 372). He indicated that he was very pleased with Plaintiff's progress (Tr. 373).

In November 2003, Dr. Netterville saw Plaintiff, who reported no complaints and denied dysphagia, odynophagia, otalgia, voice changes, or airway complaints (Tr. 341). Plaintiff indicated that she was not limited in her activities (Tr. 341). On examination, Dr. Netterville reported no abnormalities (Tr. 341). He indicated that Plaintiff was "doing quite well" without any evidence of disease (Tr. 341).

On January 26, 2004, H. Lavely, M.D., reviewed the record and concluded that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently, stand or walk for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and engage in limited pushing and pulling with the arms (Tr. 327-34). Dr. Lavely indicated that Plaintiff should avoid concentrated exposure to extreme cold and heat, wetness, humidity, and fumes, odors, dusts, and gases (Tr. 331).

In correspondence dated February 26, 2004, Dr. Netterville indicated that, due to Plaintiff's diagnosis of cancer and her medical treatment, her voice was still raspy, weak, and breathy (Tr. 339). He noted Plaintiff was able to communicate in a quiet setting but found it difficult to speak to other people with any surrounding noise (Tr. 339). Dr. Netterville indicated Plaintiff was unable to speak on the telephone (Tr. 339). Dr. Netterville noted that he was happy that Plaintiff still had her larynx and had a reasonable outcome from her surgery (Tr. 339). He indicated that Plaintiff was able to function well at home but "it would be very difficult for her to work outside her home" (Tr. 339). Dr. Netterville opined that Plaintiff's communication skills would not support her ability to work (Tr. 339).

6

In correspondence dated March 30, 2004, Dr. Shannon indicated that she had been treating Plaintiff since March 2002 (Tr. 366). Dr. Shannon indicated that she concurred with Dr. Netterville's opinion that Plaintiff's communication was limited secondary to her previous surgeries (Tr. 366). Dr. Shannon opined it would be very difficult for Plaintiff to work outside her home and that her disability was a permanent condition (Tr. 366).

In July 2004, George W. Bounds, M.D., a state agency physician, reviewed the record and concluded that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently, stand or walk for 6 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday (Tr. 395-402). Dr. Bounds indicated that Plaintiff had some environmental limitations and had some limitations with regard to her ability to speak (Tr. 399).

In correspondence dated January 5, 2006, Dr. Netterville indicated that Plaintiff's voice was still raspy, weak, and breathy (Tr. 413). He indicated Plaintiff had a "debilitating" impairment which resulted in fatigue (Tr. 413). Dr. Netterville noted Plaintiff was able to communicate in a quiet setting, but she would have difficulty speaking with other people with surrounding noise (Tr. 413). He noted that Plaintiff would require three breaks an hour and at least five or six breaks in a six-hour day due to her fatigue (Tr. 413). She would also miss five to six days a month (Tr. 413). In a subsequent questionnaire, Dr. Netterville indicated Plaintiff could lift or carry 10 pounds occasionally and less than 10 pounds frequently, stand and walk for less than 2 hours in an 8-hour workday, and sit for less than 2 hours in an 8-hours workday (Tr. 415-17). Dr. Netterville indicated Plaintiff required frequent unscheduled breaks as needed, perhaps as many as three per hour, and would be absent five to six times a month due to fatigue (Tr. 416). Dr. Netterville concluded Plaintiff had a debilitating impairment that resulted in

7

chronic fatigue based on her diagnosis of cancer and subsequent treatment (Tr. 417). He noted Plaintiff lacked the functional capacity to regularly attend employment and maintain attentiveness to work (Tr. 417).

In correspondence dated January 24, 2006, Dr. Shannon indicated that she concurred with Dr. Netterville's opinion (Tr. 414).

*Medical Expert Testimony*

Susan Bland, M.D., a medical expert who reviewed the record, testified at the hearing (Tr. 443). Dr. Bland testified that Plaintiff was diagnosed with throat cancer in 1998 and underwent radiation treatment (Tr. 446). She indicated that Plaintiff subsequently developed a recurrent nodule on her vocal cord, which was benign (Tr. 446). Plaintiff then developed voice problems in 1999 due to a lesion (Tr. 446). Plaintiff underwent surgery in 1999 (Tr. 447). Dr. Bland indicated that Plaintiff's surgeon reported in 2001, 2002, and 2003, that Plaintiff had been doing well and did not complain of any symptoms (Tr. 447). Plaintiff's surgeon indicated in 2003 that Plaintiff was not limited in her activities and was doing quite well (Tr. 447). Dr. Bland testified that subsequent notes from the surgeon indicated that Plaintiff had problems with her voice and experienced fatigue (Tr. 447). Dr. Bland testified that, since February 2004, the record showed medical improvement (Tr. 448). Dr. Bland indicated that the surgeon's notes showed that Plaintiff had no symptoms (Tr. 448). Although the surgeon reported fatigue in the most recent notes, Dr. Bland indicated the surgeon did not explain in the letter why Plaintiff was fatigued or if she had been evaluated (Tr. 448). Dr. Bland testified that there were a number of reasons for why Plaintiff could be fatigued especially since all the other notes showed that she was doing fine (Tr. 448). Dr. Bland indicated that the notes were inconsistent (Tr. 452). Dr. Bland noted that there was no indication that Plaintiff needed any kind of speech augmentation in

8

order to communicate with her physician (Tr. 448).

Dr. Bland testified that, since February 2004, Plaintiff's impairments did not meet or equal a listing-level impairment (Tr. 449). Dr. Bland opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently and should be limited from doing sensitive type jobs where she may have to call out for help or work on hazardous equipment or machinery, doing sustained overhead work, and to working with the public (Tr. 449-450). Dr. Bland indicated that Plaintiff should avoid work with required unimpaired speech (Tr. 450).

### *Vocational Expert Testimony*

Ernest Brewer, a vocational expert, testified at the administrative hearing (Tr. 453). The ALJ asked Mr. Brewer to consider a hypothetical individual with Plaintiff's age, education, and work experience who could perform light work that entailed no working with hazardous machinery or at unprotected heights, no more than occasional overhead work, no dealing with the public, no requirement of unimpaired communication or speech, and no exposure to excessive fumes, dust, or gases (Tr. 454-56). The ALJ explained "unimpaired communication or speech" as having the ability to talk in a limited amount but not to the extent that the job is dependent on unimpaired speech or communication (Tr. 456). The vocational expert testified that the hypothetical individual could perform work as a medical records clerk (2,800 jobs in Tennessee and 135,000 jobs in the national economy), food preparation worker (16,065 jobs in Tennessee and 298,000 jobs in the national economy), product packaging and hand packaging jobs (7,823 jobs in Tennessee and 156,000 jobs in the national economy), and inspector, checker, and grader jobs (7,193 jobs in Tennessee and 130,000 jobs in the national economy) (Tr. 456-58).

### III. Analysis

### **Standard of Review - Termination of Benefits - Findings of the ALJ**

9

The final decision of the Commissioner must be affirmed where the record as a whole contains substantial evidence to support the Commissioner's decision. *Drummond v. Commissioner of Social Security*, 126 F.3d 837, 840 (6th Cir.1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can go either way without interference by the courts. *Felisky v. Bowen,* 35 F.3d 1037 (6th Cir.1994). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (6th Cir. 1994); *Bogle v. Sullivan*, 998 F.2d 342, 346-47 (6th Cir. 1993). Similarly, an administrative decision is not subject to reversal because substantial evidence would have supported an opposite conclusion. *Cutlip*, 25 F.3d at 286; *Young v. Secretary of Health and Human Services*, 925 F.2d 146, 147 (6th Cir. 1990).

This is a cessation of benefits case thus the governing standard here is for disability termination, as opposed to new eligibility. *See Jones v. Sullivan,* 10 F.3d 522 (7th Cir. 1993). Under the termination standard, a claimant bears a "continuing burden" to show that she is disabled. *Matthews v. Eldridge,* 324 U.S. 319, 336 (1976). As with all other findings of fact, the Commissioner's decision on this issue need only be supported by "substantial evidence." The statutory termination standard requires substantial evidence that: (1) there has been medical improvement in the claimant's impairment(s) (other than medical improvement that is not related to the claimant's ability to work); and (2) the claimant is now able to engage in substantial gainful activity. 42 U.S.C. § 423(f). Medical improvement is any decrease in the medical severity of the impairments present at the time of the most recent favorable medical

10

determination.  20 C.F.R. § 404.1594(b)(1).  The Agency has promulgated regulations setting out

an eight-step sequential evaluation analysis for terminating disability benefits:

(1)     Is the recipient engaging in substantial gainful activity?  If so, the recipient's
disability will have ended;

(2)     If the recipient is not working, do his impairments meet or equal a listed
impairment?  If so, his disability will be continued;

(3)     If the recipient's impairments do not meet or equal a listed impairment, has there
been any medical improvement in his impairments?  If so, the analysis proceeds to
step four; if not, it proceeds to step five;

(4)     If there has been medical improvement, is it related to the recipient's ability to do
work?  If so, the analysis proceeds to step six, if not, it proceeds to step five;

(5)     If there is no medical improvement, or if the improvement is unrelated to the
recipient's ability to do work, does one of the exceptions to medical improvement
apply?  If not, the disability has continued; if so, the disability is ended;

(6)     If medical improvement is related to the ability to do work, are the recipient's
current impairments severe in combination?  If not, the disability is deemed to
have ended; if so, the analysis proceeds to step seven;

(7)     If the recipient's impairments are severe, the SSA will assess his residual
functional capacity and consider whether he can do his past work.  If so, he will be
found no longer disabled;

(8)     If the recipient cannot do his past work, the SSA will consider whether the
recipient can do other work given his residual functional capacity, age, education,
and experience.  If so, the disability will be found to have ended.

*See generally,* 20 C.F.R. § 404.1594(b)(5).

As the basis of the Februrary 22, 2007 Decision the plaintiff's disability ceased on

February 29, 2004, the ALJ made the following findings:

1.  The most recent favorable medical decision finding that the claimant was
disabled is the determination dated December 9, 1999. This is known as the
"comparison point decision" or CPD.

2.  At the time of the CPD, the claimant had the following medically determinable
impairment: recurrent cancer of the larynx. This impairment was found to meet
section 13.02B of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
404.1520(d)).

3.  Through February 29, 2004, the date the claimant's disability ended, the
claimant did not engage in substantial gainful activity (20 CFR 404.1594(f)(1)).

4.  The medical evidence establishes that, as of February 29, 2004, the claimant

had the following medically determinable impairments: history of recurrent cancer of the larynx with surgical treatment.

5. As of February 29, 2004, the claimant did not have an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

6. Medical improvement occurred as of February 29, 2004 (20 CFR 404.1594(b)(1)).

7. The medical improvement is related to the ability to work because, as of February 29, 2004, the impairment present at the time of the CPD no longer met or medically equaled a listing (20 CFR 404.1594(c)(3)(i)).

8. As of February 29, 2004, the claimant continued to have a severe impairment or combination of impairments (20 CFR 404.1594(f)(6)).

9. Based on the impairments present as of February 29, 2004, the claimant had the residual functional capacity to perform work at the light level of exertion, with the following additional limitations: avoid hazardous machinery and unprotected heights; only occasional overhead work; not dealing with the public; avoid excessive fumes, dust, or gases; and not dependent on unimpaired communication or speech.

10. As of February 29, 2004, the claimant was unable to perform past relevant work (20 CFR 404.1565).

11. On February 29, 2004, the claimant was a younger individual age 45-49 and is now closely approaching advanced age (20 CFR 404.1563).

12. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

13. Beginning on February 29, 2004, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

14. As of February 29, 2004, considering the claimant's age, education, work experience, and residual functional capacity based on the impairments present as of February 29, 2004, the claimant was able to perform a significant number of jobs in the national economy (20 CFR 404.1560(c) and 404.1566).

15. The claimant's disability ended as of February 29, 2004 (20 CFR 404.1594(f)(8)).

Tr. 17-22.

## Issues Raised

Plaintiff raises three issues:

1). The ALJ encroached on her due process rights by conducting a video hearing and denying her request for a "live" hearing;

2). The ALJ's examination of the medical expert was improper;

3). The opinions of Plaintiff's treating physicians should have been controlling; and

4). The ALJ erred in determining Plaintiff not to be credible.

## Discussion

As the Commissioner notes, Plaintiff does not directly address the issue of whether there was medical improvement in this case. This case does not involve a new application, but rather a determination of whether Plaintiff continues to be entitled to benefits. The regulations provide a specific framework for determining whether an individual's impairments continue to be disabling. The primary issue in evaluating whether an individual is still disabled is whether the evidence shows that Plaintiff's condition had medically improved and, if so, whether the medical improvement is related to Plaintiff's ability to do work.

After determining that Plaintiff's impairment or combination of impairments did not meet or equal an impairment of listing-level severity, the ALJ was next required to determine whether there was medical improvement related to Plaintiff's ability to do work. *See* 42 U.S.C. § 423(f)(1)(A); 20 C.F.R. § 404.1594. The statutory standard for medical improvement is *de minimis*; the statue merely requires "any" improvement in the beneficiary's impairments. 42 U.S.C. § 423(f); 20 C.F.R. § 404.1594(b)(1). To determine whether medical improvement has

13

occurred, the severity of the beneficiary's current medical condition is compared to the severity

of the condition "at the time of the most recent medical decision that you were disabled," or "the

comparison date"-- in this case, December 9, 1999 (Tr. 17). 20 C.F.R. § 404.1594(b)(1), (b)(7).

Therefore, to determine whether there has been medical improvement in Plaintiff's condition, the

severity of her condition in December 1999 is compared to the severity of her condition in

February 2004, the date the ALJ found her disabling condition had ceased.

In this case, the ALJ properly found that medical improvement occurred as of February

29, 2004, because Plaintiff's impairments no longer met or equaled section 13.02(B) of the

Listing of Impairments. As the ALJ noted, the medical evidence showed that Plaintiff no longer

had a recurrence of cancer since she underwent surgery in December 1999 (Tr. 17, 341, 343-44,

346). The medical expert also reviewed the entire record and concluded that Plaintiff's

impairments were not of listing-level severity (Tr. 449). Since Plaintiff's impairments were no

longer of listing-level severity, the ALJ properly found Plaintiff's medical improvement was

related to her ability to do work. 20 C.F.R. § 404.1594(c)(3)(i)("If medical improvement has

occurred and the severity of the prior impairment(s) no longer meets or equals the same listing

section used to make our most recent favorable decision, we will find that the medical

improvement was related to your ability to work."). Based on the record evidence, the ALJ

found that Plaintiff's condition had medically improved and that improvement was related to her

ability to do work. I conclude substantial evidence supports the ALJ's finding.

Plaintiff raises four issues which I will address.

1). Plaintiff argues that she was deprived due process when she was required to testify

over video as opposed to a live hearing before the ALJ and that the medical expert testified over

the telephone (*See* Doc. 12, Plaintiff's Br. at 2-3). Plaintiff indicated her representative asked

before the hearing to testify in person and that, given her difficulty with communicating, she should have testified in person. The Commissioner responds that although Plaintiff's representative may have made a verbal request for a live hearing, she did not follow the proper procedure for objecting to a video conference (Tr. 421). I do not find anywhere in the record when the request was made for a live hearing but will assume, because the parties seem to agree, it was just prior to the video conference hearing of November 9, 2006 (Tr. 423-461). As the Commissioner notes, Plaintiff received notice of the hearing a month before the hearing (Tr. 26). The notice explained that any objections should be made in writing and submitted at the earliest possible opportunity before the hearing (Tr. 27). Instead of submitting any written objections, Plaintiff signed the acknowledgment form in which she did not check the box that said that she did not want to appear at a hearing by video teleconference (Tr. 24). Plaintiff waited until right before the hearing to object to the video teleconference. Plaintiff was instructed on how to object properly to having a video teleconference but she did not do so, so I consider this objection waived.

In any event, at the start of the hearing, the ALJ noted that Plaintiff's condition may affect her ability to speak and advised her that if she needed any assistance "as far as taking a break or a drink of water or anything like that be sure to let us know" (Tr. 426). Nothing in the transcript testimony or from Plaintiff's representative or Plaintiff suggested that Plaintiff had difficulty testifying. Also, there was no indication that the medical expert could not hear Plaintiff testify. Plaintiff argues some of the hearing transcript is marked "inaudible" but does not point to any specific place in the transcript. A review of the transcript does show one place where the word inaudible appears during the testimony of the vocational expert. However, no one in the hearing asked the words to be repeated so I conclude the court reporter simply missed the word (Tr. 458).

15

The only instances when there appeared to be any difficulty hearing any one was on one occasion when the Plaintiff's representative was not heard (Tr. 451) and on one occasion Plaintiff's representative was encouraged to move nearer the microphone (Tr. 439).   Because Plaintiff does not point to anything at the hearing to suggest that she was deprived a fair hearing, and because a review of the hearing transcript shows no significant problems during the hearing, I conclude the video format did not violate her right to due process.

2)  Plaintiff next argues the ALJ's examination of the medical expert was improper.  She argues the testimony should be excluded and limited strictly to her improvement of Plaintiff's carcinoma condition.  At one point in the transcript of the hearing the medical expert does say "..I usually don't deal with those when I testify.  I, I'm familiar with them but I don't usually address those."  She is responding to whether she is familiar with the non-exertional requirements of competitive employment as occupation and performance and personal and social adjustments to work activity (Tr. 443).  However, the witness does not answer questions in this area.  Her testimony relates to her review of the medical records and whether certain restrictions such as walking and standing are supported by those records.  (See Tr. 449-450).  Because Plaintiff cites no specific testimony which is given by the medical expert, Dr. Bland, I conclude there was nothing improper about the medical expert's testimony.

3)  Plaintiff argues that the ALJ committed reversible error because he failed to give controlling weight to the opinions of her treating and primary care physicians, Drs. Netterville and Shannon. (_See_ Plaintiff's Br. at 5-6).  Drs. Netterville and Shannon opined that Plaintiff could not work due to her impairments which resulted in debilitating fatigue and the inability to communicate (Tr. 339, 366, 413-17).  A treating physician opinion, however, is entitled to controlling weight only if it is adequately supported by objective evidence and not inconsistent

16

with the other reliable evidence in the record.  20 C.F.R. § 404.1527(d)(2); *Walters v. Commissioner of Social Security*, 127 F.3d 525, 530 (6th Cir. 1997).  Here, the ALJ properly gave little weight to the opinions of Drs. Netterville and Shannon (Tr. 20).  As the ALJ noted, the opinions of Drs. Netterville and Shannon were not consistent with the overall record evidence, in particular their own treatment notes (Tr. 20).  The ALJ indicated that the progress notes did not include complaints of chronic or debilitating fatigue or chronic complaints of being unable to communicate (Tr. 20, 341-45 ).  In December 2001, Dr. Netterville indicated that Plaintiff had a "very good voice quality" (Tr. 344).  In November 2003, Dr. Netterville noted that Plaintiff was "doing quite well" and that Plaintiff reported that she was not limited in her activities (Tr. 341).  Dr. Shannon simply concurred with Dr. Netterville's opinion; however, Dr. Shannon's opinion is flawed because Dr. Netterville's opinion was not supported.  Dr. Shannon's own progress notes failed to show any debilitating findings (Tr. 367-70, 375-76).  Because the opinions of Drs. Netterville and Shannon were not supported by their own progress notes, the ALJ reasonably gave their opinions little weight (Tr. 20).

Another issue is at play in this decision.  Some of the medical evidence relates to Plaintiff's condition after December 31, 2003, Plaintiff's Date Last Insured.  Should this evidence be considered if it was prior to the administrative hearing?  Under *Difford v. Secretary of Health and Human Servs.,* 910 F.2d 1316 (6th Cir. 1990), such an approach appears to be appropriate.  In *Difford*, sometime after the claimant was granted disability benefits, the SSA conducted a review and determined that the claimant's medical condition had improved to the extent that the claimant was able to engage in substantial gainful activity.  The SSA then terminated the claimant's benefits.  The claimant appealed this cessation of benefits and, a considerable time later, a hearing was held before an ALJ to review the cessation decision.  The

17

SSA argued that the court, in reviewing the cessation decision, should consider only whether the claimant was disabled at the time of the cessation decision. The claimant argued that the proper issue was whether the claimant was disabled at the time of the hearing before the ALJ. The *Difford* court sided with the claimant stating that whether the plaintiff is "currently" disabled pursuant to 42 U.S.C. § 423(f) "compels consideration of an individual's ability to perform substantial gainful activity at the time of the hearing." *Id.* at 1320. Thus, under *Difford*, it would appear that the relevant date, in reviewing the cessation decision in this case, would be the July 2005, the date of the last administrative hearing. In other words, if the plaintiff was unable to perform substantial gainful activity as of July 2005, then the decision to terminate his benefits was incorrect.

However, *Henley v. Commissioner of Social Security*, 58 F.3d 210 (6th Cir. 1995) requires a different conclusion. In *Henley*, the claimant was awarded disability benefits in 1981. The SSA found the claimant no longer disabled and terminated his benefits in 1983. The plaintiff went through several administrative appeals and judicial appeals following remands before a final administrative hearing was held before an ALJ in 1988. However, in the meantime, in March of 1986, the claimant's date of last insured expired. Thus the claimant's date of last insured came about two years before the final hearing before the ALJ. The court held that in reviewing the cessation of benefits decision, the court can consider only whether the claimant was disabled on or before his date of last insured status, not up to the last administrative hearing date because "[w]hen one loses insured status, one is simply no longer eligible for benefits arising thereafter." *Id.* at 213 (quoting *Moon v. Sullivan,* 923 F.2d 1175, 1182 (6th Cir. 1990)). Looking at the findings of the ALJ in this case, the ALJ recognizes that the question was whether Plaintiff was disabled on the date her benefits ceased. In this case, Plaintiff's date of last insured

18

was December 31, 2003 and she was found to be no longer disabled as of February 29, 2004. Because Plaintiff's date of last insured was prior to the cessation date, the ALJ was correct in determining Plaintiff's RFC as of February 29, 2004, the date she was found no longer disabled. If one were to assume for the sake of argument that Plaintiff's condition deteriorated between February 29, 2004 and the administrative hearing of November 9, 2006, such that she was again disabled, she would not be entitled to disability and insurance benefits because she would be past her date of last insured. In this case if Plaintiff is now disabled, she would be entitled only to SSI benefits, not Disability and Disability Insurance Benefits. The practical effect of this is the record would have to support a finding of disability no later than February 29, 2004. In this case, there is substantial evidence to show medical improvement. In fact the only evidence supporting her claim, that of significant fatigue arises after her date last insured. Under *Henley*, that evidence could not be considered except to the extent it could be found to relate back to the date last insured. Although it is true that the Sixth Circuit holds that the opinions of treating physicians are entitled to great weight and generally are entitled to greater weight than the contrary opinions of consulting physicians who examine the claimant only on a single occasion (*Farris v. Secretary of Health and Human Services*, 773 F.2d 85, 90 (6th Cir. 1985)), that is not the case when there is other evidence of record to the contrary or when opinions are not properly supported. I conclude that the record here is not uncontradicted and that the ALJ was not required to accept the opinion of the treating physicians. When there are conflicts in the record, it is the ALJ's duty to weigh the medical evidence and medical opinions. The resolution of conflicts in testimony are the province of the Commissioner and not the courts. *Smith v. Heckler*, 760 F. 2d 184,187 (8th Cir. 1985).

4) Finally, Plaintiff argues the ALJ erred in not considering her to be a credible witness.

(*See* Doc. 12, Plaintiff's Br. at 6).  Here, the ALJ reviewed the record and concluded Plaintiff's allegations of a disabling condition were not fully credible.  The ALJ set forth Plaintiff's testimony and the standard for evaluating credibility (Tr. 18-19).  The ALJ then noted that the overall objective findings and the opinions of Drs. Bland and Lavely undermined Plaintiff's allegations of a disabling condition (Tr. 19-20).  The ALJ noted that Plaintiff did some household chores, drove, including 40 miles a few days before the hearing, and attempted to work during the same period she alleged she was disabled (Tr. 19, 127-28, 145-51, 431, 433-34).  Based on the record as a whole, the ALJ reasonably concluded that Plaintiff's allegations of a disabling condition was not supported by the evidence.  Substantial evidence supports the ALJ's finding, and an ALJ's credibility finding is entitled to considerable deference, and reviewing courts do not generally make de novo credibility findings.  *See Buxton v. Halter*, 246 F.3d at 773 ("The ALJ's findings as to a claimant's credibility are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints.").

Thus, the record as a whole, undermined Plaintiff's allegations of disability.  To the extent Plaintiff had credible work-related limitations, the ALJ accommodated them when he restricted Plaintiff to a range of light work.  While Plaintiff may disagree with the ALJ's weighing of the evidence, the ALJ's decision was certainly within the zone of reasonable choices.  *See Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986) ("The substantial evidence standard allows considerable latitude to administrative decision makers.  It presupposes that there is a zone of choice within which the decision makers can go either way, without interference by the courts.").

## IV. Conclusion

For the reasons stated herein, I RECOMMEND the Commissioner's decision be

AFFIRMED.   I further RECOMMEND:

(1) The plaintiff's motion for summary judgment (Doc. 11) be DENIED;

(2) The Commissioner's motion for summary judgment (Doc. 15) be GRANTED; and

(3) A judgment enter DISMISSING this action.[2]


Dated:  November 16, 2009              *s/William B. Mitchell Carter*
                                             UNITED STATES MAGISTRATE JUDGE

---

[2]Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure.  Failure to file objections within the time specified waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 149, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general.  *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).